UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | | |
|---|---|---|
| BILLY N. EDGE, JR., and SAMRA EDGE, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00273-SKL |
| | ) | |
| SRA MANAGEMENT, LLC, | ) | |
| d/b/a Olympus Property, LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant SRA Management, LLC's Motion for Summary Judgment, with a supporting brief and exhibits [Doc. 40 & Doc. 41]. Plaintiffs Billy Edge, Jr., and Samra Edge filed a response in opposition with supporting exhibits [Doc. 56], and Defendant filed a reply [Doc. 57]. This matter is now ripe.[1] Neither party requested a hearing and the Court finds a hearing is not necessary. The motion will be granted in part and denied in part.

**I.    BACKGROUND**

At all relevant times, Billy, Samra, and their daughter lived in an apartment at the Legends at White Oak in Ooltewah, Tennessee. Defendant managed the complex. The Edge family moved into the apartment in August 2017. On or about February 15, 2022, Billy called the leasing office

---

[1] Also pending are Defendant's Motion to Exclude and/or Disqualify Thomas Reese [Doc. 42], and Motion for Spoliation Sanction [Doc. 44], which the Court addresses in a separate memorandum and order entered contemporaneously herewith. The Court may cite to filings associated with those motions herein, as many of the exhibits are identical to those related to the instant motion for summary judgment.

to complain because he was running out of hot water too quickly to finish a shower [Doc. 40-1 at Page ID # 332]. Defendant was responsible for maintenance at the apartment complex and so on February 16, it dispatched a maintenance employee, Daniel Cansler, to investigate. Cansler testified the temperature on the hot water heater was set to "about 125" degrees Fahrenheit at that time [Doc. 40-3 at Page ID # 458]. He explained the hot water heater has two thermostats, and he increased the temperature on the bottom thermostat "roughly about 10, 15 degrees." [*Id.*].

Billy testified that the family still did not have adequate hot water [Doc. 40-1 at Page ID # 337]. As a result, Billy put in another maintenance request on February 17, and Cansler came out to the apartment again on the 18th. This time, Cansler replaced the "top thermostat" [Doc. 40-3 at Page ID # 460]. Cansler testified that he then set the top thermostat to "match" the bottom thermostat, which again, Cansler claimed was set at about 135 degrees [*id.* at Page ID # 461]. However, Cansler also testified during his deposition that a photograph, which he had personally taken, showed the thermostat was set at "just below 150." [*Id.* at Page ID # 463].

Cansler described his post-repair conversation with Billy as follows:

> I told him [Billy] that I'd replaced the top – the thermostat and that I set it to match the bottom one, which is, you know, where I had turned them up a couple days prior. I asked him if he wanted me to leave it where it was at or cut them down a little bit and he said he wanted hot-hot water. I said, well, it's going to be hot, so if it's too hot, let me know, and I'll come back and cut it down.

[*Id.* at Page ID # 461]. Billy testified that Cansler told him the water would be "hot," but not that it was "going to be very hot, hot hot" [Doc. 40-1 at Page ID # 343].

The faucet on the bathtub is equipped with a rotational limit stop, or scald guard, which can operate to limit the temperature of the water coming out of the faucet or shower head regardless

2

of the temperature set on the hot water heater.[2]  It must be manually set.  However, Cansler did not adjust the device after he changed the temperature on the hot water heater in the Edges' apartment, nor did he measure the temperature of the water coming out of the faucet [Doc. 40-3 at Page ID # 466-68].

On February 19, at around 11:30 p.m., Billy turned on the water to take a bath.  He testified during his deposition that he turned the handle on the faucet all the way to the left, which he knew was the hottest possible temperature [Doc. 40-1 at Page ID # 354].  He testified that this was his usual practice when taking a bath.  He explained:

> I go in there and turned the knob all the way to the left like I normally do, and . . . the hot water was just right at that time, and so I just – I assumed the same thing when I turned it all the way up.  I left the bathtub to go get my clothes, my towels and stuff, and bring them back into the bathroom.
>
> From there, I sat there and I kind of run my hand through the water, but, you know, with diabetic neuropathy, I don't feel the same heat as you would in my hands.  And so I thought, okay, and I stepped into the tub, not feeling nothing different.  And as I started to lower myself down into the tub, that's when I realized how hot it was and got out.

[*Id.* at Page ID # 353].  Billy admitted he did not measure the temperature of the water before getting in the tub, nor did he test the temperature with any part of his body that was not affected by diabetic neuropathy, although he retained some feeling in his hands.  He testified he stood in the tub for about two to three minutes, "contemplating how to get down," before he got out [*id.* at Page ID # 361].  He then walked into his living room and noticed the skin on his feet was peeling

---

[2] The hot water heater in the Edge family's apartment specifically states: "Water temperature over 125°F can cause severe burns instantly or death from scalds.  Children, disabled and elderly are at highest risk of being scalded.  See instruction manual before setting temperature at water heater. Feel water before bathing or showering.  Temperature limiting valves are available, see manual." [Doc. 56-3 at Page ID # 1587].

3

off, so he called out for Samra and Jasmine to help. Samra called an ambulance, and Billy was transported to the emergency room at Erlanger, a local hospital. After about five or six hours, he was transferred to a burn treatment center at Vanderbilt in Nashville, where he remained for about three weeks. Eventually, he had to have his left foot amputated, though the parties dispute whether the amputation was a result of the burns Billy suffered from the bath.

A few days after the incident, Cansler returned to the Edge family's apartment, and at that time, he turned the hot water heater "back down to about 125." [Doc. 40-3 at Page ID # 461].

Plaintiffs filed suit in the Hamilton County Circuit Court, and the case was removed to this Court on November 3, 2022. In their amended complaint, which was filed in the state court case prior to removal and is the operative complaint, Plaintiffs assert:

> 32.     On February 19, 2022, until the present day, Mr. Edge continues to endure pain, suffering, [and] loss of enjoyment of life as a result of the negligence of Defendant's maintenance man.
>
> 33.     As a result of the Defendant's negligence, Mr. Edge [had] his left food amputated, as a result of negligence of the Defendant's maintenance man, Mr. Edge has had the big toe on his right foot amputated.[3] . . .
>
> 34.     The Defendant's maintenance man had a duty to exercise reasonable care to avoid creating dangerous living conditions for the residents of the Defendant's apartment complex. The maintenance man breached that duty of care when he adjusted the thermostat on the water heater to 145 degrees Fahrenheit. The maintenance man's negligence was the cause and proximate cause of Mr. Edge's third degree burns on [his] feet and ankles, infection of his foot and amputation of his left foot.

---

[3] The record reflects Billy's left pinky toe was amputated prior to this incident [*see* Doc. 40-1 at Page ID # 321], and his left foot was amputated following the incident. Billy's right foot has never been amputated, nor have any toes from his right foot [*id.*].

4

35. Under the theory of vicarious liability, the Defendants[4] are liable for the negligence of the maintenance man.

36. As a result of the negligence of the Defendants, Mr. Edge sustained significant and permanent personal injuries, including significant medical charges, loss of earning capacity, pain, suffering, loss of enjoyment of life, future medical expenses, future pain and suffer[ing], and future loss of enjoyment of life. Plaintiff Samra Edge has suffered loss of consortium [and] society of friendship as a result of the injuries caused by the defendant.

**WHEREFORE**, Plaintiff Billy Edge hereby files his complaint against the Defendants and demands a judgement of $3,000,000.00. Plaintiff Samra Edge hereby files her lawsuit against the Defendants and demands a judgement of $350,000.00. The Plaintiffs seek a trial by jury and all costs be assessed against the Defendants.

[Doc. 1-1 at Page ID # 10-11].

On July 18, 2023, Defendant filed a Motion for Spoliation Sanction [Doc. 44], a Motion to Exclude and/or Disqualify Thomas Reese [Doc. 42], and the instant Motion for Summary Judgment [Doc. 40]. The Court addresses the spoliation motion and the Reese motion by separate order entered contemporaneously herewith. As explained in greater detail in that Order, which is hereby adopted and incorporated herein, the Court finds Plaintiffs spoliated the position or setting of the rotational limit stop when Reese conducted testing on the device. However, dismissal is not warranted due to the spoliation, nor is exclusion of Reese's finding that the rotational limit stop was not properly set to limit the water temperature to 120°F at the time of Reese's test. Further, while Reese cannot opine as to the precise or approximate numerical temperature of Billy's bath or the water flowing from the bathtub faucet on February 19, 2022, Reese's testimony should not

---

[4] Although the amended complaint sometimes uses "Defendants," plural, there is only one defendant in this case, SRA Management. Similarly, many filings quoted herein use the singular "Plaintiff," although there are two Plaintiffs in this case.

be excluded in its entirety.  Keeping these holdings in mind, the Court now turns to Defendant's motion for summary judgment.

## II.    SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1).  When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must

6

set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).

The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. Spoliation

Defendant argues Plaintiffs claims should be dismissed due to their spoliation of evidence of the position or setting of the rotational limit stop during Reese's testing. As the Court addressed in more detail in the order addressing that motion, the Court finds such a harsh sanction is not warranted in this case. Defendant's motion for summary judgment will be denied to the extent it seeks dismissal of Plaintiffs' claims due to Plaintiffs' spoliation of this evidence.

### B. Amputation-Related Damages

Defendant takes the position it is entitled to dismissal of any damage claims related to the amputation of Billy's left foot. Defendant points out the operative complaint incorrectly alleges the big toe on Billy's right foot was amputated. All parties agree Billy's right foot is fully intact.

This error in the amended complaint (which was initially filed in state court) can be addressed in the final pretrial order, which supplants the pleadings.

Concerning Billy's left foot, Defendant argues: "Dr. Wagner is Plaintiffs' only medical proof, and her testimony clearly demonstrates Mr. Edge's left foot amputation was not the result of his burn injuries." [Doc. 41 at Page ID # 711]. As discussed below, cause-in-fact and proximate cause are both elements necessary to Plaintiffs' Tennessee state law negligence claims. *See Morris v. Wal-Mart Stores, Inc.*, 330 F.3d 854, 858 (6th Cir. 2003). "Cause-in-fact, sometimes called actual cause, means the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019) (cleaned up). To establish that Defendant's conduct is the proximate cause of Billy's injuries/amputation, Plaintiffs must show, *inter alia*, that Defendant's conduct was a "substantial factor in bringing about the harm complained of." *Id.* (citation omitted).

Defendant emphasizes that prior to the February 19 incident, Billy had "chronic pressure ulcers to his feet, which are commonly seen in diabetics" like Billy [Doc. 41 at Page ID # 710 (quoting Dr. Wagner's deposition testimony)]. Dr. Wagner testified Billy had at least one such ulcer on the bottom of his left foot and another on the tips of the toes on his left foot when he arrived at Vanderbilt on February 20, 2022 [Doc. 40-5 at Page ID # 677-78]. She testified these were not caused by the bathtub burn [*id.*].

Dr. Wagner performed a skin graft operation on Billy on March 8, 2022, the second of two operations he received at Vanderbilt. The first operation used cadaver skin grafts, and "a little more than a week [later]," Dr. Wagner performed a second skin graft procedure using skin from Billy's thigh [*id.* at Page ID # 674-75]. Dr. Wagner testified that, as of the date of her operation, Billy had a "healthy, bleeding wound bed" with no signs of infection [*id.* at Page ID # 675]. She

explained: "That means that when I removed the well adher[ed] allograft, the wound bed was appropriate for having his own skin placed on it, for getting an autograft. If there was evidence of an infection, if the allograft didn't look like it really adhered well, we wouldn't go forward with the procedure." [*Id.* at Page ID # 676]. Dr. Wagner testified that she excised, or removed, burned skin, but only from the top of Billy's foot [*id.* at Page ID # 676]. When discussing photographs taken following the procedure, Dr. Wagner testified:

> So this is his right foot after placement of his own skin. You can see all this area that has this meshing pattern is his own skin that was taken from his thigh.
>
> This is the outside of the same foot or the lateral part of that foot. You can see exactly where it ends, and you can see what parts of his toes were affected.
>
> This is the left foot. Same thing. You can see that it affected primarily the top of his foot, as I stated.
>
> And once again, same thing. You can see that it – it affected – that the graft was placed over the – the top of the foot and the lower ankle.

[*Id.* at Page ID # 677]. She further stated that she did not place skin grafts over Billy's chronic wounds, including the ulcers on the bottom of Billy's left foot and the tips of his left toes, nor did she remove skin from the bottom of his feet [*id.* at Page ID # 676-78].

Billy was discharged from Vanderbilt on March 15, 2022 [*id.* at Page ID # 683]. Dr. Wagner testified that Billy was not on antibiotics at that time. She further testified:

> This is his left foot on discharge. And I don't want to brag, but it looks really good from a burn surgeon standpoint. His graft looks well adherent. You can see that it's pink and looks well vascularized. This is the left foot.
>
> . . . .
>
> Yeah. Overall, it looks like he had a . . . a pretty good pick of his graft that he had done.

9

[*Id.*].  She then testified the left foot was close to 95% closed on discharge, and that she was "very happy with it," despite generally being "very picky." [*id.*].  She asserted there was no indication Billy would require an amputation at that time [*id.* at Page ID # 685].

Plaintiffs' entire response on this issue, which follows, cites only to testimony from Dr. Wagner and Billy:

> Mr. Edge's left foot was amputated because of an infection he contracted due to the wounds on his feet.  Dr. Wagner testified that hot liquid of 150 degrees Fahrenheit can cause third degree burns in five seconds.  [Exhibit 5, p.14:13-22].  A skin graft surgery was then performed on the burns on Mr. Edge's feet.  [Exhibit 5, p.20:1-20]  Mr. Edge then was discharged while his foot wounds were still 5%-10% open.  [Exhibit 5, p.54:20-25, p.55:1-25].  Mr. Edge's foot subsequently got infected.  [Exhibit 1, p.145:3-25].  The infection caused Mr. Edge to go septic.  [Exhibit 1, p.145:3-25, p.146:1-25].  Mr. Edge was treated with strong antibiotics, and his left foot was amputated.  [Exhibit 1, p.145:3-25, p.146:1-25].

> Dr. Wagner's testimony that Defendant relies on to show that the amputation was not related, proves that the amputation, more likely than not, was related to the burns and subsequent infection.  At the time of discharge, Mr. Edge's wounds were still 5% to 10% open, which left him open to infection.  He ultimately did contract an infection that cost him his left foot.

[Doc. 56 at Page ID # 1342].

In the response to the motion for summary judgment, Plaintiffs do not challenge Defendant's assertion that Dr. Wagner is "Plaintiffs' only medical proof" relevant to the summary judgment amputation damages issue even though Plaintiffs list three additional medical doctors in their expert disclosures [*see* Doc. 42-1] and five total doctors on their witness list [Doc. 52], including the doctors who appears to have performed the amputation.  Because Plaintiffs do not indicate in their response to the motion for summary judgment that they intend to rely on testimony or proof from any doctors other than perhaps Dr. Wagner to support their claim that the left foot

amputation was caused or necessitated by the burn wounds from the February 19 bath, the Court will not address the testimony or proof of any doctors or experts other than Dr. Wagner in connection with damages related to the amputation. *See McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) ("A party may not present a skeletal argument, leaving the court to put flesh on its bones.").[5]

Plaintiffs do not cite to any specific testimony from Dr. Wagner addressing the cause of the infection that allegedly led to amputation of Billy's left foot. The Court has read the entire transcript of Dr. Wagner's testimony [Doc. 40-5], and as far as the Court can tell, Dr. Wagner does not testify to the likely source or cause of the infection at all—whether originating from a burn wound or a diabetic ulcer wound, nor does she testify that the burn caused Billy's chronic diabetic ulcers or even that the condition of the ulcers worsened as a result of the burn. Most of her testimony concerns the skin grafting procedures performed on the top of Billy's feet and the results therefrom. As Defendant argues, Dr. Wagner's testimony reflects that Billy's skin graft wounds were in good condition when he was discharged.

Plaintiffs also rely on Billy's testimony. A lay person may testify about their symptoms, including when they began, and "may even testify regarding causation, if that causation is within a lay person's realm of knowledge." *Williams v. Hamilton Cnty.*, No. 1:15-cv-74, 2018 WL 1586234, at *2 (E.D. Tenn. Mar. 31, 2018) (citations omitted). However, "a plaintiff may not testify as to causation where technical or specialized testimony is necessary, such as where there

---

[5] Plaintiffs' amended complaint states: "29. Mr. Edge started smelling an odor coming from his third-degree burn on his left foot. That odor was an indicating of an infection from his third degree burn on his left foot. 30. Mr. Edge's left foot was infected, and the doctors were concerned with Mr. Edge becoming septic, placing his life in jeopardy." [Doc. 1-1 at Page ID # 9]. Paragraph 29 cites to "Exhibits 12 and 13" of the amended complaint, which appear to be photos of Billy's foot. The photos are not at all clear. The relevant areas are mostly just dark space. Plaintiffs do not reference the amended complaint or the photos in their response.

11

are multiple possible causes of an injury or where specialized medical issues are involved." *Id.*; *see also Jama v. City of Memphis*, No. 03-2965 Ma/P, 2006 WL 5499283, at *3 (W.D. Tenn. Dec. 29, 2006) ("While a lay witness may be competent to testify, for example, that a laceration was caused by a cut from a sharp object, Jama's complaints of pain and physical difficulties do not have such an obvious source.  Jama is not competent to testify about the cause of his injuries."); *Tankesly v. Orton*, No. 3:14-C-011, 2018 WL 4953231, at *5 (M.D. Tenn. Oct. 11, 2018) ("Plaintiff is barred from offering testimony as to . . . medical causation.  However, Plaintiff may testify to his own experiences and sensations.").

Billy testified to the following during his deposition:

> Q. So I understand from your medical records that at some point after your discharge from Vanderbilt some blisters came up on your left . . . foot. . . .
>
> A. Yes, sir.
>
> Q. Okay.  Tell me about those blisters.
>
> A. I don't know what to say.  I was – they just came about.  I don't know what to say about that.
>
> Q. You don't know how they came about?
>
> A. No, sir.
>
> Q. So you're discharged from Vanderbilt.  You make it home.  About how long after your discharge did they show up?
>
> A. Honestly, I don't know, because I didn't even really recognize them as far as blisters, you know.  I just thought it was all part of the healing process.
>
> Q. Okay.  And did they – at some point did they pop or turn into a wound, an open wound of some kind?
>
> A. I think that the one on my left foot may have turned into a wound.  I don't know, to be honest with you.

Q.      Well, were those – did you hit your foot on something –

A.      No, sir.

. . .

A.      Not that I know of.

Q.      You're not – you're just not sure how those blisters on your left foot came about after you were discharged?

A.      No, sir, I'm not.

Q.      Did you treat those – for those blisters at Erlanger Wound Care?

A.      Yes, sir.

Q.      Okay.  And how did they treat you?

A.      They would sit there and cut the dead skin off and stuff around it and everything, and all the black skin and stuff and they gave me the stuff to wrap it and everything on a daily basis and that's what we did.

[Doc. 40-1 at Page ID # 386-87].  Accordingly, even if Billy could testify as to causation—which he clearly cannot—he does not.[6]

Again, the only proof Plaintiffs cite in support of their claim that the burn injuries were the legal and proximate cause of the amputation is Dr. Wagner's testimony and Billy's testimony. Neither of them testified as to any cause for or source of the infection that ultimately led to amputation.  Although it is not clear when the infection began, the amputation took place in June 2022, approximately three months after Billy was discharged from the Vanderbilt burn treatment

_____

[6] In addition, although not cited to by Defendant, the Court notes Billy described how a similar blister on his left foot led to an infection which ultimately resulted in the amputation of his left pinky toe in 2021, about a year prior to the incident at issue in this case [Doc. 40-1 at Page ID # 309-10].  The doctor who amputated Billy's pinky toe diagnosed Billy with diabetic neuropathy in his feet in connection with the amputation procedure [*id.*].

center in good condition, with no infection. After careful consideration, the Court concludes Defendant has met its burden and is entitled to summary judgment on this issue. Plaintiffs have not identified a material fact in dispute concerning whether Defendant's negligence was the proximate cause or actual cause of Billy's amputation. The evidence Plaintiffs cite to in their response, even viewed in the light most favorable to Plaintiffs and making all reasonable inferences in their favor, is not sufficient to show a genuine issue of material fact for trial on this issue. *See Hinton v. United States*, No. 3:20-cv-00633, 2023 WL 4849796, at *5 (M.D. Tenn. July 27, 2023) (defendant entitled to summary judgment on amputation-related medical malpractice claim where plaintiff failed to produce evidence of proximate cause; noting "the plaintiff has a very complicated medical history of uncontrolled diabetes, a prior amputation of his left leg below the knee from a similar infected foot wound, and a documented habit of failing to comply with medical recommendations" and further that plaintiff delayed seeking treatment for infection that led to amputation); *see also Elswick v. Pikeville United Methodist Hosp. of Ky., Inc.*, 50 F. App'x 193, 196 (6th Cir. 2002) (applying Kentucky law, holding: "Stated simply, where a hospital patient suffers a staph infection following surgery, even if the fact finder could reasonably find the hospital to have been negligent in the care of that patient such a finding of negligence does not equate with proof that the negligence was a proximate cause of the staph infection and the ensuing suffering.").

Accordingly, Defendant's motion for summary judgment [Doc. 40] will be **GRANTED** to the extent Defendant seeks dismissal of any damages claim related to the amputation of Billy's left foot.

14

## C.     Exception to Landlord Non-Liability & Comparative Fault

Defendant argues this case should be dismissed in its entirety because Plaintiffs cannot establish Defendant's liability as a landlord under the undisputed facts of this case. Relatedly, Defendant also argues Plaintiffs' recovery is barred by Billy's own comparative fault.

Tennessee state law governs these issues. *See Romines v. Hall Steel Co.*, No. 3:06cv0367, 2007 WL 9783241, at *4 (M.D. Tenn. May 3, 2007) ("Because this is a diversity action and all of the plaintiff's claims are state tort law causes of action based upon acts and injuries that allegedly occurred in Tennessee, the Court must apply the substantive law of Tennessee." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999))). Plaintiffs' claims are based on Defendant's alleged negligence. Under Tennessee law, a claim for negligence requires proof of (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; (3) an injury to the plaintiff; (4) causation in fact; and (5) proximate, or legal, causation. *Morris*, 330 F.3d at 858.

As relevant to the case at bar, "a landlord is generally not liable to a tenant or a third party for harm caused by a dangerous condition on the leased premises." *Billiot v. Cove Mountain Realty, Inc.*, No. 3:05-CV-252, 2006 WL 1899845, at *2 (E.D. Tenn. July 11, 2006) (citing *Lethcoe v. Holden*, 31 S.W.3d 254, 256 (Tenn. Ct. App. 2000)). There are exceptions to this general rule, however:

> The first exception involves dangerous conditions on the premises existing at the time of the lease when the landlord has actual or constructive notice of the condition and the tenant does not. The second exception involves dangerous conditions caused either by the landlord's failure to make repairs it has a duty to make or the landlord's negligence in performing repairs, regardless of whether it had a duty to make the repairs. The third exception involves the dangerous conditions on portions of property over which the landlord has retained control. The fourth exception involves

> dangerous conditions on property leased for purposes involving the
> admission of the public.

*Russell v. Chattanooga Prop. Mgmt., LLC*, No. E2020-016610COA-R3-CV, 2022 WL 214560, at

*4 (Tenn. Ct. App. Jan. 25, 2022) (quoting *Denton v. Hahn*, No. M2003-00342-COA-R3-CV,

2004 WL 2083711, at *6 (Tenn. Ct. App. Sept. 16, 2004)).  Defendant's opening brief addresses

only the first exception.  Plaintiffs' response clarifies that their theory of Defendant's liability is

premised entirely on the second exception, under which landlords may be held liable for their

negligence in performing repairs to the leased premises [Doc. 56 at Page ID # 1329-30].

The Tennessee Court of Appeals addressed the negligent repair exception in *Allen v.

Sulcer*, 255 S.W.3d 51, 56 (2007), explaining "landlords owe a duty of reasonable care to their

tenants," and "[w]hen a landlord undertakes to repair or maintain some part of the premises, he

owes his tenants a duty to exercise ordinary and reasonable care in seeing the repairs are properly

made." (citations omitted).  In *Allen*, the landlord hired the tenant's father (who was also a tenant)

to prune some "large limbs from a tree on the rental property."  *Id.* at 52.  The father had no

experience or training trimming trees and was afraid of heights.  The father asked the plaintiff, his

daughter, to assist with clearing debris as he trimmed.  The plaintiff was struck by a large falling

tree limb and seriously injured.  The plaintiff sued the landlord.  The trial court dismissed her

claims, finding the father was an independent contractor, and as such, the landlord was not liable

for the father's negligence while pruning the trees. The appeals court reversed, finding the trial

court "overlooked the fact that . . . [the plaintiff] was a tenant of Mr. Sulcer and failed to account

for the possibility of Mr. Sulcer's negligence as a landlord."  *Id.* at 56.  The court noted the

"dispositive question is whether [the plaintiff] encountered a harm whose foreseeability gave rise

to a duty of reasonable care on the part of Mr. Sulcer, the landlord, to protect her from the danger

of falling limbs."  *Id.*  The court answered the question in the affirmative:

We find that Mr. Sulcer had a duty to select someone who would know how to minimize the risk of trimming such large branches. Engaging an unskilled and tentative tenant to trim a limb of this size and height at that particular location created a foreseeable probability of harm. Although falling limbs are obviously dangerous to the reasonable person on the ground, the unpredictable trajectory of a large limb improperly trimmed makes the risk unreasonable. Mr. Sulcer knew there were other occupants, including a two year old child, on the premises; identified the limb and so appreciated its size; and did not avail himself of any measures to lower the chances of harm to his tenants. The prudent person acting with the expected "degree of forethought and intelligence" would perceive the risk and take steps to limit it.

*Id.* at 58-59.

The court rejected the landlord/defendant's argument that it owed no duty to the plaintiff because the risk of falling limbs was open and obvious. *Id.* at 58. The court specifically concluded "that an open and obvious danger does not automatically result in a finding of no duty and therefore no landowner liability." *Id.* Considering Tennessee's adoption of a system of modified comparative fault, the court found "a risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by a defendant's conduct outweigh the burden upon the defendant to engage in alternative conduct that would prevent the harm." *Id.* (citation omitted). Applying that balancing test, the court found that while the risk of harm of falling limbs was obvious, the trajectory of a particular branch while falling to the ground was not. Further, based on the plaintiff's injuries, the court found the gravity of harm was significant, and the burden on the landlord to hire a professional or at least offer to help was minimal. As such, the Court found the landlord had a duty to "select someone who would know how to minimize the risk of trimming such large branches." *Id.* Finally, the court found the question of the plaintiff's comparative fault was for the jury to decide.

In this case, Cansler is Defendant's employee, and it appears he was acting within the scope of his employment. Defendant does not argue otherwise. Accordingly, Defendant, as Cansler employer, can be held vicariously liable. *See Freeman v. Wal-Mart Stores East, LP*, 781 F. Supp. 2d 661, 666 (E.D. Tenn. 2011) (citations omitted).[7]

A case cited by Plaintiffs, *Sneed v. Henderson*, 366 S.W.2d 758 (Tenn. 1963) involved an employee of the defendant-landlord, rather than an independent contractor. A tenant called because her gas-operated refrigerator was not working properly. A maintenance worker, who was "not a skilled refrigerator man," went to the apartment, relit the gas burner that powered the refrigerator, then left. *Id.* at 764-65. Two days later, one of the tenants and another occupant were hospitalized for carbon monoxide poisoning. The tenant later died. The trial court denied the defendant-landlord's motion for a directed verdict, and the Tennessee Court of Appeals affirmed, holding:

> [W]e find that when the defendants through their agent Banks undertook to repair the refrigerator in the apartment of the deceased they owed a duty to do that which a man exercising ordinary and reasonable care would have done under like to similar circumstances. They also owed a duty not to omit the doing of any act which a man of ordinary care would not omit to do under the same standard.

---

[7] At times in their response, Plaintiffs argue Defendant was negligent in hiring an inexperienced and unqualified "hobbyist" to perform the repair, similar to the allegations in *Allen* regarding the landlord's use of an "independent contractor" to trim the trees. The amended complaint appears to be based entirely on vicarious liability and not on any sort of negligent hiring claim/theory. There are no allegations relating to Cansler's unfitness for the job/inexperience or Defendant's knowledge thereof in the amended complaint. *See Young v. GLM Transp., Inc.*, No. 1:18-cv-147-SKL, 2019 WL 13197710, at *3 (E.D. Tenn. Nov. 1, 2019) (discussing elements of negligent hiring claim). Because the Court finds Plaintiffs' vicarious liability claims survive, it is not necessary at this time to resolve whether Plaintiffs have stated a viable claim related to Defendant's negligence in hiring Cansler as its employee or in relying on Cansler to address Plaintiffs' hot water heater issues. To the extent Plaintiffs do assert a claim based on Cansler's unfitness, the Court finds there are questions of fact regarding Cansler's lack of training/experience with hot water heaters and Defendant's knowledge thereof.

18

. . . .

> The jury in this case reached the conclusion, no doubt, that the landlord through its employee Banks knew or should have known that the gas refrigerator was not in proper working condition when the burner went out and the employee was called to relight it or to repair the refrigerator. And, therefore, such employee should have taken proper steps to thoroughly inspect the refrigerator and to restore it to a proper and safe condition; that is, safe for use to which it was normally put and safe for the occupants of the apartment who lived therein.

*Id.* at 764.

Defendant argues it did not owe a duty of care in this case because the "availability of hot water is not an unreasonably dangerous condition." [Doc. 41 at Page ID # 702]. Defendant cites business invitee cases in support of this argument, such as parking lot trip and fall cases, which hold that "[b]usinesses have a duty to remove or warn against dangerous conditions on their premises." *Tester v. Walmart, Inc.*, 856 F. App'x 586, 588 (6th Cir. 2021) (citations omitted) (applying Tennessee law). Plaintiffs' theory of liability centers on Cansler's negligent repair, however. Regardless, Defendant argues the cases stand for the proposition that the risks associated with hot water causing burns are a matter of common sense, and furthermore Billy admitted he was aware of such risks, such that "the availability of water capable of causing scalding is not an unreasonably dangerous condition." [Doc. 41 at Page ID # 706]. As a result, Defendant contends, it "did not owe [Billy] a duty to warn of or remove a condition which is not unreasonably dangerous as a matter of law." [*Id.*].

The Court finds the balancing test described in *Allen* should be applied to answer the question of whether Defendant owed Billy a duty of reasonable care. That is, "a risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by a defendant's conduct outweigh the burden upon the defendant to engage in

19

alternative conduct that would prevent the harm." *Allen*, 255 S.W.3d at 58. In this case, even though the capacity of hot water to cause burns is a matter of common sense, it was not entirely unforeseeable that Billy would not be able to properly test the temperature of the water due to his medical condition, of which Cansler admits he was at least somewhat aware [*see* Doc. 40-1 at Page ID # 465 ("He told me he had the diabetes and that he – that he couldn't really feel his feet too good, couldn't hold the bike up." "Right. And that's why he sold the motorcycle to you; correct?" "Yeah . . .")]. In addition, Cansler testified that he told Billy he set the top thermostat to "match" the bottom one, which he had set the day before and which setting did not result in scalding water. The gravity of harm is clearly significant. The burden on Cansler to test the water temperature or check the rotational limit stop device was minimal. As Reese testified and indicated in his report, these actions are standard practice in the plumbing industry. Balancing these factors, the Court finds Defendant were under a duty to act with reasonable care, despite the obviousness of the risks associated with extremely hot water. The Court acknowledges Defendant's point that the carbon monoxide at issue in *Sneed* is less obvious to perceive than hot water is for most people (although not necessarily for Billy at shallow depths) and finds this fact is not dispositive.

Defendant directs the Court's attention to *Severn v. A.O. Smith Corporation*, No. 07-97-0151-CV, 1998 WL 254444 (Tex. Ct. App. May 20, 1998), an unpublished case decision issued by the Texas Court of Appeals in 1998. In that case, the plaintiffs and their friends were staying at a hotel. The plaintiffs were injured after getting into a whirlpool bathtub that their friends had filled "with only hot water." *Id.* at *1. The appeals court affirmed the trial court's summary dismissal of the plaintiffs' premises liability claims asserted against the company that managed the hotel. The appeals court reasoned, in part:

> Our courts recognize that when a risk is open and obvious
> and of which an invitee knows or of which it is charged with

20

knowledge, then the owner owes the invitee no duty to warn of the risk. In the Severns' deposition testimony, each acknowledged that they were aware that hot bathwater could cause scalding. The Severns' mutual acknowledgment that they were aware such a risk existed precludes any duty on the part of McMahon to warn of the risk.

. . . .

Our holding is based on the open and obvious risk associated with the use of hot water. The open and obvious nature of this risk is confirmed by the Severns' admitted knowledge of it. Because hotel guests expect the availability of hot water in their rooms and the characteristics and risks associated with hot water are a matter of common knowledge, the availability of water capable of causing scalding is not an unreasonably dangerous condition. The summary judgment evidence conclusively establishes that the Severns could not meet the second element of their premise liability claim. Therefore, the trial court's granting of summary judgment on that claim for McMahon was proper. We overrule the Severns' fifth point of error and affirm the judgment of the trial court.

*Id.* at *7-8.

The non-binding case is distinguishable. For one, it did not involve an allegedly negligent repair, and the court specifically found: "We agree that the premise[s] liability claim is the only claim maintainable by the Severns and, therefore, the only claim we need to address. This is so because Texas law recognizes a distinction between a negligent activity and unsafe premises liability." *Id.* at *6. The court's reasoning regarding the motel owner's lack of duty due to the open and obvious nature of the risk applied only to the premises liability claim. In its reply, Defendant argues *Severn* "had nothing to do with intricacies of 'contemporaneous negligent activity' versus 'premises liability.'" [Doc. 57 at Page ID # 1858]. However, Defendant fails to address *Allen*'s holding that a landlord can have a duty to act with reasonable care even in the face of an open and obvious risk: "a risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by a defendant's conduct outweigh the

burden upon the defendant to engage in alternative conduct that would prevent the harm." 255 S.W.3d at 58.

Defendant argues Cansler warned Billy the water would be "hot hot." [Doc. 57 at Page ID # 1860]. Even if one were to assume this vague warning could absolve Defendant of its responsibility to undertake repairs with reasonable care, there are questions of fact regarding the extent of Cansler's "warning." Billy specifically denied being told that the water would be "hot hot." [Doc. 40-1 at Page ID # 343]. Cansler testified he told Billy that he replaced the top thermostat and set it to the same temperature as the bottom thermostat, which he had set two days earlier. The adjustment of the bottom thermostat clearly did not make the water scalding hot and furthermore, it isn't entirely clear if Billy requested hotter water or just *more* hot water at the same temperature so that his family could all take complete, hot showers. Notably, Cansler does not claim to have warned Billy that the water was set to any specific temperature, that the temperature setting could produce third degree burns in less than 30 seconds, or that the safety device was not properly set.

On a related note, even if, as Defendant contends, Cansler's conduct in setting the hot water heater to a temperature in excess of 120°F did not constitute negligence, this does not resolve the question of whether Cansler's failure to check the temperature of the water from the bathtub faucet and/or the position of the rotational limit stop fell below the applicable standard of care. *See Sneed*, 366 S.W.2d at 586 ("[S]uch employee should have taken proper steps to thoroughly inspect the refrigerator and to restore it to a proper and safe condition; that is, safe for use to which it was normally put and safe for the occupants of the apartment who lived therein.").

Defendant also argues it did not have actual or constructive notice of the positioning of the rotational limit device. It emphasizes "[t]here is no evidence in the record a 'reasonable landlord'

22

would have discovered an issue with the rotational limit stop through regular walk-throughs, inspections, or maintenance." [Doc. 41 at Page ID # 701]. Again, Defendant does not explain how this argument addresses Plaintiffs' theory that the Defendant's repair of the hot water heater was undertaken without reasonable care.

Defendant also argues Cansler's work "was not a 'repair' subject to the exception to the general rule." [Doc. 57 at Page ID # 1854]. The Court disagrees. Cansler replaced the thermostat and adjusted the temperature on the hot water heater in response to Plaintiffs' maintenance requests. As far as the Court is concerned, this is as much a "repair" as the tree trimming at issue in *Allen* or the relighting of the gas burner on the refrigerator at issue in *Sneed*. The cases Defendant cites do not convince the Court otherwise or even address the issue of whether a "repair" was undertaken.

Finally, Defendant argues the undisputed facts show Billy is at least 50% at fault for his injuries, such that Defendant is entitled to summary judgment under Tennessee's modified comparative fault system [Doc. 41 at Page ID # 708-09]. Defendant emphasizes that Billy submitted a maintenance request for hot water, admitted he turned the faucet handle to allow the water to flow at the hottest possible temperature, knew that hot water can cause burns, and got in the bathtub without checking the temperature except for very briefly with his hand, which has diminished feeling due to diabetic neuropathy. Defendant points out Plaintiffs' own expert, Reese, stated Billy was 50% at fault.

Under Tennessee law, "in a vast majority of cases, the comparison and allocation of fault is a question of fact to be decided by the finder-of-fact, that is the jury or the trial court sitting without a jury." *Henley v. Amacher*, No. M1999002799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. Jan. 28, 2002) (citing cases). "The task of comparing and allocating fault may be

taken from the jury only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's." *Id.* While Defendant is correct that Tennessee courts (and this Court applying Tennessee law) "have and do grant and affirm summary judgment based on comparative fault" [Doc. 41 at Page ID # 709], the facts of this case, when viewed in the light most favorable to Plaintiffs, do not warrant such a result. In the cases Defendant cites, the plaintiffs could readily observe the hazards at issue and "took no action to avoid [them]." *Johnson v. Wal-Mart Stores East, L.P.*, No. 1:08-CV-67, 2009 WL 540213, at *12 (E.D. Tenn. Mar. 4, 2009). The instant case is not analogous.

Billy testified that he went through his normal bath time routine, in the bathtub he had used countless times before. He was assured by Cansler that the hot water heater was "fixed" [Doc. 40-1 at Page ID # 327]. Billy had no reason to think Cansler "fixed" the hot water heater by setting the temperature so high that it could cause serious injury, nor did he have any reason to think Cansler failed to take steps that a reasonable plumber would have taken to keep the water temperature reasonably safe for Billy and his family to use.

Unlike in the cases Defendant cites, Billy could not readily "observe" the actual temperature of the bath water. He testified there was no steam coming from the bathtub or fog on the bathroom mirror [*id.* at Page ID # 362]. It is fair to infer from his testimony that checking the water temperature with say, his elbow or knee (or some other body part not affected by neuropathy), would have been a difficult, if not impossible, safe maneuver. Billy testified that he ran his hand through the water, he just did not feel how hot it was [*id.* at Page ID # 353]. His family was asleep, as it was 11:30 at night. Defendant emphasizes that Billy turned the faucet handle to the hottest temperature setting, but Billy testified that he always used that setting and it typically was the "perfect temperature" for him [*id.* at Page ID # 334]. It is certainly true that "an

24

individual has a duty to take reasonable care for his or her own safety." *Goumas v. Mayse*, No. 2013-01555-COA-R3, 2014 WL 1713195, at *9 (Tenn. Ct. App. Apr. 29, 2014).  And is it also true Billy did not retrieve a thermometer and measure the water temperature before putting his feet in his bathtub.  Nevertheless, the Court finds that, viewing the facts as presented in the light most favorable to Plaintiffs, a reasonable juror could find Billy was less than 50% at fault.

## IV.      CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [Doc. 40] is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** to the extent it seeks to dismiss any claim for damages pertaining solely to the amputation procedure.  The motion is **DENIED** in all other respects.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

25