UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

BILLY N. EDGE, JR., and SAMRA EDGE,   )
                                          )
       Plaintiffs,                  )
                                          )
v.                                 )         No. 1:22-cv-00273-SKL
                                          )
SRA MANAGEMENT, LLC,         )
d/b/a Olympus Property, LLC,      )
                                          )
       Defendant.              )

## MEMORANDUM AND ORDER

Before the Court are Defendant SRA Management, LLC's Motion to Exclude and/or Disqualify Thomas Reese, with a supporting brief and exhibits [Doc. 42, Doc. 43, & Doc. 51], and Motion for Spoliation Sanction with a supporting brief and exhibits [Doc. 44 & Doc. Doc. 45]. Plaintiffs Billy Edge, Jr., and Samra Edge filed a response and supporting brief as to each of the motions [Doc. 46 & Doc. 47 (in response to the Reese motion); Doc. 48 & Doc. 49 (in response to the sanctions motion)]. Defendant filed a reply in support of each motion [Doc. 54 (Reese motion) & Doc. 55 (sanctions motion)]. These matters are now ripe. Neither party requested a hearing and the Court finds a hearing is not necessary.[1]

## I.    BACKGROUND

At all relevant times, Billy, Samra, and their daughter, Jasmine,[2] lived in an apartment at the Legends at White Oak in Ooltewah, Tennessee. Defendant managed the complex. The Edge family moved into the apartment in August 2017. On or about February 15, 2022, Billy called the

---

[1] Also pending is Defendant's motion for summary judgment, which the Court addresses in a separate memorandum and order entered contemporaneously herewith.

[2] Jasmine is not a party to this case.

leasing office to complain because he was running out of hot water too quickly to finish a shower [Doc. 40-1 at Page ID # 332]. Defendant was responsible for maintenance at the apartment complex and so on February 16, it dispatched a maintenance employee, Daniel Cansler, to investigate. Cansler testified the temperature on the hot water heater was set to "about 125" degrees Fahrenheit at that time [Doc. 40-3 at Page ID # 458]. He explained the hot water heater has two thermostats, and he increased the temperature on the bottom thermostat "roughly about 10, 15 degrees." [*Id.*].

Billy testified that the family still did not have adequate hot water [Doc. 40-1 at Page ID # 337]. As a result, Billy put in another maintenance request on February 17, and Cansler came out to the apartment again on the 18th. This time, Cansler replaced the "top thermostat" [Doc. 40-3 at Page ID # 460]. Cansler testified that he then set the top thermostat to "match" the bottom thermostat, which again, Cansler claimed was set at about 135 degrees [*id.* at Page ID # 461]. However, Cansler also testified during his deposition that a photograph, which he had personally taken, showed the thermostat was set at "just below 150." [*Id.* at Page ID # 463].

Cansler described his post-repair conversation with Billy as follows:

> I told him [Billy] that I'd replaced the top – the thermostat and that I set it to match the bottom one, which is, you know, where I had turned them up a couple days prior. I asked him if he wanted me to leave it where it was at or cut them down a little bit and he said he wanted hot-hot water. I said, well, it's going to be hot, so if it's too hot, let me know, and I'll come back and cut it down.

[*Id.* at Page ID # 461]. Billy testified that Cansler told him the water would be "hot," but not that it was "going to be very hot, hot hot" [Doc. 40-1 at Page ID # 343].

The faucet on the bathtub is equipped with a rotational limit stop, or scald guard, which can operate to limit the temperature of the water coming out of the faucet or shower head regardless

2

of the temperature set on the hot water heater.[3]  It must be manually set.  However, Cansler did

not adjust the device after he changed the temperature on the hot water heater in the Edges'

apartment, nor did he measure the temperature of the water coming out of the faucet [Doc. 40-3 at

Page ID # 466-68].

On February 19, at around 11:30 p.m., Billy turned on the water to take a bath.  He testified

during his deposition that he turned the handle on the faucet all the way to the left, which he knew

was the hottest possible temperature [Doc. 40-1 at Page ID # 354].  He testified that this was his

usual practice when taking a bath.  He explained:

> I go in there and turned the knob all the way to the left like I
> normally do, and . . . the hot water was just right at that time, and so
> I just – I assumed the same thing when I turned it all the way up.  I
> left the bathtub to go get my clothes, my towels and stuff, and bring
> them back into the bathroom.
>
> From there, I sat there and I kind of run my hand through the
> water, but, you know, with diabetic neuropathy, I don't feel the same
> heat as you would in my hands.  And so I thought, okay, and I
> stepped into the tub, not feeling nothing different.  And as I started
> to lower myself down into the tub, that's when I realized how hot it
> was and got out.

[*Id.* at Page ID # 353].  Billy admitted he did not measure the temperature of the water before

getting in the tub, nor did he test the temperature with any part of his body that was not affected

by diabetic neuropathy, although he retained some feeling in his hands.  He testified he stood in

the tub for about two to three minutes, "contemplating how to get down," before he got out [*id.* at

Page ID # 361].  He then walked into his living room and noticed the skin on his feet was peeling

---

[3] The hot water heater in the Edge family's apartment specifically states: "Water temperature over
125°F can cause severe burns instantly or death from scalds.  Children, disabled and elderly are at
highest risk of being scalded.  See instruction manual before setting temperature at water heater.
Feel water before bathing or showering.  Temperature limiting valves are available, see manual."
[Doc. 56-3 at Page ID # 1587].

off, so he called out for Samra and Jasmine to help. Samra called an ambulance, and Billy was transported to the emergency room at Erlanger, a local hospital. After about five or six hours, he was transferred to a burn treatment center at Vanderbilt in Nashville, where he remained for about three weeks. Eventually, he had to have his left foot amputated, though the parties dispute whether the amputation was a result of the burns Billy suffered from the bath.

A few days after the incident, Cansler returned to the Edge family's apartment, and at that time, he turned the hot water heater "back down to about 125." [Doc. 40-3 at Page ID # 461].

Plaintiffs filed suit in the Hamilton County Circuit Court, and the case was removed to this Court on November 3, 2022. In their amended complaint, which was filed in the state court case prior to removal and is the operative complaint, Plaintiffs assert:

> 32. On February 19, 2022, until the present day, Mr. Edge continues to endure pain, suffering, [and] loss of enjoyment of life as a result of the negligence of Defendant's maintenance man.
>
> 33. As a result of the Defendant's negligence, Mr. Edge [had] his left food amputated, as a result of negligence of the Defendant's maintenance man, Mr. Edge has had the big toe on his right foot amputated.[4] . . .
>
> 34. The Defendant's maintenance man had a duty to exercise reasonable care to avoid creating dangerous living conditions for the residents of the Defendant's apartment complex. The maintenance man breached that duty of care when he adjusted the thermostat on the water heater to 145 degrees Fahrenheit. The maintenance man's negligence was the cause and proximate cause of Mr. Edge's third degree burns on [his] feet and ankles, infection of his foot and amputation of his left foot.

---

[4] The record reflects Billy's left pinky toe was amputated prior to this incident [*see* Doc. 40-1 at Page ID # 321], and his left foot was amputated following the incident. Billy's right foot has never been amputated, nor have any toes from his right foot [*id.*].

4

35.     Under the theory of vicarious liability, the Defendants[5] are liable for the negligence of the maintenance man.

36.     As a result of the negligence of the Defendants, Mr. Edge sustained significant and permanent personal injuries, including significant medical charges, loss of earning capacity, pain, suffering, loss of enjoyment of life, future medical expenses, future pain and suffer[ing], and future loss of enjoyment of life. Plaintiff Samra Edge has suffered loss of consortium [and] society of friendship as a result of the injuries caused by the defendant.

**WHEREFORE**, Plaintiff Billy Edge hereby files his complaint against the Defendants and demands a judgement of $3,000,000.00. Plaintiff Samra Edge hereby files her lawsuit against the Defendants and demands a judgement of $350,000.00. The Plaintiffs seek a trial by jury and all costs be assessed against the Defendants.

[Doc. 1-1 at Page ID # 10-11].

The instant motions relate to testimony and an expert report by Tommy Reese, a plumber whom Plaintiffs intend to present as an expert witness. In a document titled, "Plaintiff's Expert Disclosures," Plaintiffs state:

Mr. Reese is expected to testify to the temperature of the bath water after defendant made changes to the plaintiff's water heater. Mr. Reese is expected to testify that the water temperature flowing from plaintiff's bathtub faucet reach[ed] between 147°F and 149°F when he put his feet into the tub.

[Doc. 42-1 at Page ID # 715]. Mr. Reese's expert report describes the work he performed:

We reviewed the photographs produced to Plaintiff's counsel showing the position of the thermostat[6] on Plaintiff's hot water heater.

---

[5] Although the amended complaint sometimes uses "Defendants," plural, there is only one defendant in this case, SRA Management. Similarly, many filings quoted herein use the singular "Plaintiff," although there are two Plaintiffs in this case.

[6] The top thermostat [Doc. 40-4 at Page ID # 526].

We visited the subject premises and tested the water temperature, at the faucet, with the thermostat set exactly as what was depicted in the photograph produced in discovery.

We reviewed pertinent portions of the International Plumbing Code that related to this scenario.

[Doc. 42-2 at Page ID # 720].

During his deposition, Reese explained that, after his initial test, he removed the handle of the tub faucet, and observed the rotational limit stop was "adjusted high," meaning it was not limiting the temperature [Doc. 40-4 at Page ID # 534]. Reese "moved it to the lower setting," and measured the water temperature again. This time, the water temperature measured at 120 degrees. Reese therefore concluded the rotational limit stop was working properly but "wasn't set right." [*Id.*]. Before leaving, Reese reset the rotational limit stop back to the higher setting and the hot water heater back to 120°F.

Reese's expert report also describes "Safety Standards," including that:

The above captioned injury involved hot water heaters and thermostats. The accepted safety standard in the plumbing community is that a thermostat on a residential hot water heather should be set no higher than 120°F to prevent risks of scalds and burns.
. . . .
Regardless of the thermostat setting, the water temperature should not exceed a maximum of 120°F when measured at the faucet of a residential bathtub. All residential hot water heaters have thermostats that are factor set at 120°F unless specified differently by state requirements. Keeping the thermostat setting at 120°F will reduce the risk of scalds. The water temperature at the faucet level should always be tested, if the thermostat is set above 120°F.

[Doc. 42-2 at Page ID # 720]. Reese confirmed in his testimony that, any time the temperature setting on a hot water heater is adjusted, the temperature of the water coming out of the faucet and the scald guard should also be checked [Doc. 40-4 at Page ID # 617].

The report's "Discussion" and "Conclusions" sections further provide:

6

The thermostat at issue in this case is a thermostat that measures the outside temperature of the water heater. Therefore, the water temperature can and sometimes does run a few degrees hotter than the thermostat setting. Each water heater and thermostat combination can vary, but based on my testing, the water temperature for this specific water was hotter than the thermostat setting, which is not an unusual finding.

Our water temperature test at the Plaintiff's apartment revealed that the water flowing from Plaintiff's bathtub faucet, when measured with the thermostat set to the same position as depicted in Defendant's discovery responses, the water was between 147°F and 149°F. Pursuant to the safety standards set forth above, water flowing from a residential bathtub faucet should not exceed 120°F. Anything above 120°F poses a substantial burn risk. Any safeguards, if any, that may have been in place to prevent the water temperature at the faucet from exceeding 120°F were not working appropriately at the time of my testing.
. . . .
The water temperature, measured from the faucet, at Mr. Edge's apartment was 27°F to 29°F higher tha[n] the accepted safe maximum temperature setting of 120°F, as suggested in the International Plumbing Code and Manufacturer's Installation Guide. Keeping the water temperature at 120°F, when measured from the faucet, as recommended by plumbing standards, would have prevented the risk of scalds and burns.

The above opinions were based upon our work performed, my analysis and experience, and the materials reviewed to date.

[Doc. 42-2 at Page ID # 721].

As mentioned, Defendant filed a motion for "spoliation sanctions," which relates to the testing Reese performed at the Plaintiffs' apartment [Doc. 44], as well as a motion to exclude or disqualify Reese from testifying [Doc. 42]. The Court will address each motion in turn.

## II.     MOTION FOR SPOLIATION SANCTIONS

### A.     Standards

The authority to impose sanctions for spoliated evidence arises from "a court's inherent power to control the judicial process." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)

7

(citation omitted). As it relates to physical evidence, a court may sanction a litigant for spoliation of evidence if: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party destroyed it with a culpable state of mind; and (3) the destroyed evidence was relevant to the opposing party's claim or defense. *Byrd v. Alpha Alliance Corp.*, 518 F. App'x 372, 378 (6th Cir. 2013); *McCarty v. Covol Fuels No. 2, LLC*, 664 F. App'x 372, 378 (6th Cir. 2016). An obligation to preserve arises "when a party should have known that evidence may be relevant to future litigation." *Byrd*, 518 F. App'x at 384 (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010)). In determining whether a party should have known that evidence may be relevant to future litigation, courts apply an objective, not subjective, standard. *Id.* at 384. A culpable state of mind "requires a showing that the party destroyed the evidence knowingly or negligently." *Id.* Finally, demonstrating that destroyed evidence was "relevant" requires "showing that the evidence would have been relevant to a contested issue . . . such that a reasonable trier of fact could find that it would support that claim." *McCarty*, 644 F. App'x at 379.

### B. Analysis

Defendant's position is that Reese's testing of the rotational limit stop constitutes spoliation. Defendant appears to concede Reese did not destroy or alter the device itself, and further that the device "worked as intended" during Reese's test [Doc. 45 at Page ID # 746]. Defendant takes issue with the fact that Reese adjusted its setting to see whether it would limit the temperature of the water flowing from the faucet [Doc. 55 at Page ID # 1320-21 ("Mr. Reese's 're-creation' resulted in a clear spoliation of key evidence—the position of the rotational limit stop. The setting of the thermostat on the water heater is not enough, alone, to prove the Plaintiffs' claims. The Plaintiffs must establish that the rotational limit stop was improperly set, and that

Defendant knew it was improperly set prior to February 19, 2022. However, due to the Plaintiffs'

spoliation and the lack of documentation from Mr. Reese's 'recreation,' no party is able to prove

the position of the rotational limit stop.")].

In their response, Plaintiffs recite Reese's testimony describing the steps he took to test the

device, then argue the rotational limit stop was not actually spoliated:

> Mr. Cansler, the defendant's maintenance man who set the plaintiffs' thermostat at "just below 150°" testified that he did not know that "if the temperature setting of the hot water heater was changed, the setting on these valves must be adjusted manually." (Exhibit 2, 22:10-16). After setting the temperature at "just below 150°F," Mr. Cansler did not adjust the rotational limits stop. (Exhibit 2, 22:17-18). Mr. Cansler did not measure the temperature of the bath water after increasing the water heater thermostat to "just below 150°F." (Exhibit 2, 22:19-23).
>
> The rotational limits stop is in the same condition as when Mr. Reese observed it. Mr. Reese testified that "after taking off the faucet, you can adjust the rotation limits stop." Mr. Reese did nothing to destroy or spoliate the condition of the rotational limits stop to prevent the defendant from performing its own inspections on the rotational limits stop at issue.
>
> The defendant offers no evidence that Mr. Reese destroyed the rotational limits stop to prevent the defendant from performing their own inspection and test of the rotational limits stop. It is up to the province of the jury to accept or reject testimony, including expert testimony, in whole or in part.
> . . . .
> The defendant has known since March 6, 2023, that Mr. Reese inspected the rotational limits stop. Instead of hiring their own plumber to inspect it, they claim that the rotational limits stop was destroyed. The rotational limits stop is in the same condition as when Mr. Reese found it. As such, the Defendant's Motion for Spoliation Sanctions should be denied.

[Doc. 49 at Page ID # 1293].

Plaintiffs do not explicitly address Defendant's argument that **the position or setting** of

the rotational limit stop was spoliated by Reese's testing; nor do they argue Reese's testing was

9

not performed knowingly. Reese did not take any photographs of the device prior to changing its position, and Defendant was not invited to participate in Reese's testing of the device. The only recorded evidence from the test (besides Reese's recounting of the results in his report and testimony) is a video of Reese measuring the temperature of the water before he changed the position or setting of the rotational limit stop. The video shows water coming out of a bathtub faucet, and Reese can be heard on the video reporting that the temperature of the water measured between 145°F and 149°F. The video itself is not clear enough for the viewer to see the temperature shown on Reese's thermometer. There is no recording of Reese's measurement of the water temperature after he adjusted the position of the rotational limit stop.

Nevertheless, considering Plaintiff's theory of liability and the other evidence in the record, the importance of the exact position of the device and any prejudice to Defendant in connection with Reece's testing is not entirely clear. In their response in opposition to Defendant's motion for summary judgment, Plaintiffs clarify: "The negligence in this case was hiring an unqualified 'hobbyist' to do repairs, the setting of the water temperature just below 150 degrees Fahrenheit, and the failure to measure the water temperature or the rotational limit stop after doing so." [Doc. 56 at Page ID # 1337]. Cansler candidly admitted he did not check, or even know the existence of, the rotational limit stop when he turned the temperature on Plaintiffs' hot water heater up from 125°F (where it was set when Plaintiffs first complained about insufficient hot water) to at least 135°F to 140°F (where it was set when Billy was injured).[7]

---

[7] Cansler testified at one point in his deposition that he set the thermostat to "just below 150." [Doc. 40-3 at Page ID # 463]. At another point, he testified that the thermostat setting "wasn't 150," but rather "[i]t was about 135, 140." [*Id.* at Page ID # 469]. In his expert report, Reese states that Cansler set the thermostat to 140°F, which he determined by looking at the photograph Cansler took of the thermostat [Doc. 42-2 at Page ID # 719].

In addition, Reese's first test was performed before he adjusted or even viewed the rotational limit stop. The water flowing from the faucet measured 145°F and up, indicating one of the following: (1) there was no rotational limit stop in place, (2) any rotational limit stop was defective, or (3) the rotational limit stop was not set to limit the water temperature to 120°F. It is undisputed there was a rotational limit stop installed in the faucet and that the device was not defective [*see* Doc. 45 at Page ID # 745 ("The rotational limit stop was present and working properly on March 2[,] 2023.")]. At the very least, Reese's work did not deprive Defendant of the opportunity to test whether the device was defective. In addition, the only work Cansler described doing after the incident related to Plaintiffs' hot water heater/bathtub faucet was to turn the hot water heater thermostat down [Doc. 40-3 at Page ID # 461]. In other words, there is no indication Defendant or anyone else repaired or replaced the rotational limit stop at any time between February 19, 2022, and March 23, 2023.

As for the cases cited by Defendant, in *Loukinas v. Roto-Rooter Services Company*, 855 N.E.2d 1272 (Ohio Ct. App. 2006), the parties agreed to postpone an excavation of the subject site, but the plaintiff proceeded with the excavation without notifying the defendant. The plaintiff's expert, who conducted the excavation, opined that the defendant had installed an "oil interceptor too close to the clay drain line," and that the defendant had "[broken] the line with its backhoe bucket during the installation." *Id.* at 1276. The court found, among other things, that the plaintiff's expert's use of a "power-assisted digger to excavate within two feet of the drain line" could itself have caused damage to the drain line. *Id.* at 1279. As a result, the excavation "destroyed the opportunity to produce evidence of the line's condition or placement that would have been favorable" to the defendant. *Id.* The court concluded the plaintiff had spoliated evidence and excluded the expert's affidavit.

In *Williams v. Daimler Chrysler Corporation*, No. 1:05 CV 1380, 2008 WL 11383316 (N.D. Ohio Dec. 3, 2008), the plaintiff was involved in a single-car accident. The cause of the accident was hotly disputed—the plaintiff's theory was that there was a "defect in the lock housing of the steering column," and the defendant's theory was that the plaintiff veered off the road while she was reaching into the passenger side floorboard for her books. *Id.* at *2. In support of its theory, the defendant cited the position of the books in the car and the position of the plaintiff's body following the crash. The plaintiff had the vehicle inspected by an expert. The defendant claimed that prior the inspection, the gearshift lever was covered in blood, which supported its theory. Following the inspection, the gearshift lever was wiped clean. The plaintiff argued there was no spoliation because other substances inside the car that appeared to be blood were tested and none were blood. The court rejected the plaintiff's argument, finding "this does not conclusively establish that blood was not on the gearshift." *Id.* at *7. The court concluded spoliation had occurred, but found dismissal (the sanction sought by the defendant) was not appropriate. Ultimately the case settled, and it appears the court never awarded sanctions.

In *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995), the plaintiff's decedent died after his boat caught on fire and exploded. The plaintiff sued the manufacturer, "contending that the fire resulted from a faulty bilge pump switch which sparked and ignited vapors from a leaking fuel system." *Id.* at 151. The plaintiff's expert theorized that gasoline vapors escaped from a leak "in the fuel tank vent hose," which was in contact with the boat's underframe. *Id.* at 155. The expert opined that the "routing of the fuel vent hose through the boat's cabin amounted to a defective design." *Id.* The district court found that the expert spoliated significant evidence in examining the boat, noting the boat was "attacked . . . with a chain saw and sledge hammer," and that the "area which is critical to the theory eventually presented by [the expert] was literally

ripped apart." *Id.* The district court instructed the jury they were permitted to consider the destruction of the evidence when considering the expert's credibility, and furthermore, that the jury could infer the destroyed evidence was not favorable to the plaintiff. The Fourth Circuit affirmed, finding the district court "provided the jury with appropriate guidelines for evaluating the evidence." *Id.* at 157.

These cases are all distinguishable. *Loukinas* and *Vodusek* involved the destruction of evidence central to the parties' contested theories of liability. In *Williams*, while the alleged blood splatters were not central to the defendant's case, they could have at least supported the defendant's theory. In this case, the only evidence actually spoliated was the precise position of the rotational limit stop. But we already know, from Reese's non-destructive testing, that the device was not set to the to limit water temperature to 120°F, and that Cansler did not check the setting of the device or the temperature of the water when he turned the temperature up on the hot water heater.

Nevertheless, Defendant is only required to "make some showing indicating that the destroyed evidence would have been relevant to the contested issue," *McCarty v. Covol Fuels No. 2, LLC*, 644 F. App'x 372, 379 (6th Cir. 2016) (cleaned up), and the Court cannot conclude the position of the rotational stop device is not in any way relevant. Plaintiffs cannot deny Reese changed the position of the device without Defendant's knowledge or presence and without any photographs or video footage of the position prior to the change. Regardless, the Court finds that while Plaintiffs spoliated evidence, none of Defendant's proposed sanctions take into account that Reese's initial non-destructive test showed the device was not properly set to 120°F, which Reese testified that he visually confirmed prior to adjusting the position of the device. Defendant does not argue or cite to evidence showing the position of the device was changed at any point after Billy's incident but before Reese's "destructive" test. Indeed, Defendant's contention that

13

Plaintiffs spoliated evidence rests on the assumption that the rotational limit stop remained in the same position from the time of the subject incident until Reese moved it [*see, e.g.*, Doc. 57 at Page ID # 1856 ("Because Mr. Reese and Plaintiffs' counsel adjusted the rotational limit stop during their private inspection without documentation, SRA Management will never be able to independently confirm the setting of the rotational limit stop on the date of the incident.")]; *see also BancorpSouth Bank v. Herter*, 643 F. Supp. 2d 1041, 1062 (W.D. Tenn. 2009) ("the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction" (citations omitted)); *Jain v. Memphis Shelby Cnty. Airport Auth.*, No. 08-2119-STA-dkv, 2010 WL 711328, at *3 (W.D. Tenn. Feb. 25, 2010) (noting that one of the purposes of sanctions for spoliation is to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party," and that the "severity of the sanction should correspond to the actual prejudice suffered by the party who has been denied discovery" (citation omitted)).

Considering the foregoing, Defendant's proposed sanctions all go too far in light of Plaintiffs' theory of liability and the facts of this case as revealed thus far. Rather than craft its own alternative sanction, however, the Court will require the parties to confer and jointly propose a limiting jury instruction that accounts for the points made herein.

One final point for the parties to consider during their conferral: Defendant contends Plaintiffs proceeded in a "clandestine manner" to "manipulate the evidence to . . . ensure the rotational limit stop was set to full open." [Doc. 45 at Page ID # 749]. There is no indication that Plaintiffs, their counsel, or Reese have misrepresented their observations that day. Plaintiffs' counsel, an officer of the Court, was present for the testing. Defendant can cross-examine Reese

regarding his observations, his failure to document certain aspects of his test, and any other issues or alleged deficiencies, such as Reese's prior relationship with Plaintiffs' counsel.[8]  However, the Court finds the current record does not justify any inference of such deceitful behavior by Plaintiffs or their counsel.

## III.    MOTION TO EXCLUDE AND/OR DISQUALIFY THOMAS REESE

Also pending is Defendant's Motion to Exclude and/or Disqualify Thomas Reese [Doc. 42].  Defendant argues Reese's testimony is subject to exclusion under Federal Rules of Evidence 401, 402, 403, and 702.

### A.    Standards

Federal Rule of Evidence 702 governs the admissibility of testimony by expert witnesses and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise _if the proponent has demonstrated by a preponderance of the evidence that_:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and

---

[8] In its brief filed in support of its motion for summary judgment, Defendant complains it cannot "verify the condition and setting of the rotational limit stop on the date of the incident without wholly trusting the actions and testimony of Plaintiffs, [Plaintiffs' counsel], and Mr. Reese." [Doc. 41 at Page ID # 698].  Defendant contends it cannot trust their testimony in part because Reese and Plaintiffs' counsel "know each other personally through their church and Mr. Reese's testimony appears to be nothing more than a favor for a friend." [_Id._ at Page ID # 698 n.9].  Again, while this may be a proper topic for cross-examination, it does not mean Reese's testimony should be excluded.

(d) the ~~expert has reliably applied~~ <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

Fed. R. Evid. 702[9]; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-95 (1993) (construing Rule 702). However, "the Rule 702 inquiry is 'a flexible one.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal citations omitted). "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test'" and "adds that the gatekeeping inquiry must be "'tied to the facts' of a particular 'case.'" *Id.* (quoting *Daubert*, 509 U.S. at 591-93). The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702: (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008).

With respect to the first requirement, courts consider whether the expert's qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract. *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the

---

[9] Rule 702 is set to be amended, effective December 1, 2023, pending approval of the United States Supreme Court and absent action by Congress that modifies or rejects the changes. *See Al Qari v. Am. Steamship Co.*, No. 21-cv-10650, 2023 WL 5202311, at *4 (E.D. Mich. Aug. 14, 2023). The changes are underlined and struck through in the above-quoted version of the rule. Defendant cites to the proposed version of Rule 702, and Plaintiffs do not object. The changes are "simply intended to clarify how Rule 702 should have been applied all along." *Anderson v. United States (In re Anderson)*, No. 21-00042, 2023 WL 2229355, at *3 (W.D. Tenn. Jan. 20, 2023) (citation and quotation marks omitted). "The new language makes clear that the burden is on the proponent to demonstrate to the Court that an expert's testimony more likely than not meets the four enumerated requirements for admissibility." *Id.* The Court finds that the new version of the Rule does not change the Court's analysis, and as such, the Court applies the new version of the rule herein as well as cases applying the language under the current version of the rule.

expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

As for the second requirement, courts must consider whether the proffered expert testimony is relevant under Rule 401. *Daubert*, 509 U.S. at 587 (citing Fed. R. Evid. 401). Pursuant to Rule 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (citations omitted). In addition, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

The third requirement, reliability, "does not indicate, in any way, the correctness or truthfulness" of opinion testimony. *In re Scrap Metal*, 527 F.3d at 529. It is assessed according to the factors set forth in Rule 702—whether the opinion is based on sufficient facts or data and is the product of reliable principles and methods, and whether those principles and methods were reliably applied. *Id.* (citing Fed. R. Evid. 702). Thus, an expert's testimony must be supported by "'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 595). It must rest "upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30. Reliability focuses not on the conclusions drawn, but on the methodology employed by the expert. *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529); *see also Daubert*, 509 U.S. at 595.

In determining whether expert testimony "is the product of reliable principles and methods," Fed. R. Evid. 702(c), courts may consider whether the methods and principles have

been and are capable of being tested, whether they have been subjected to peer review and publication, their known or potential rate of error, and whether they are generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. The inquiry is flexible, and the district court may also consider other factors that bear on the reliability of the expert's testimony. *See Kumho*, 526 U.S. at 149–50 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."); *United States v. Mallory*, 902 F.3d 584, 592–93 (6th Cir. 2018) (noting that all factors do not necessarily apply in every case); *see, e.g.*, *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434–35 (6th Cir. 2007) (approving consideration of the extent to which an expert's opinion was prepared solely for litigation in determining its reliability).

"[R]ejection of expert testimony is the exception rather than the rule," *In re Scrap Metal*, 527 F.3d at 530, and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Burgett*, 579 F. App'x at 376 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Additionally, as the United States Supreme Court explained in *Daubert*, when assessing proposed expert testimony under Rule 702, courts "should also be mindful of other applicable rules." 509 U.S. at 595 (citing Rule 403, among other examples); *see also id.* ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the

present rules exercises more control over experts than over lay witnesses." (cleaned up)). Pursuant to Rule 403:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. Rule 403 provides an independent basis to exclude expert testimony that otherwise comports with the Federal Rules of Evidence. *See, e.g.*, *United States v. Semrau*, 693 F.3d 510, 516 (6th Cir. 2012).

## B. Analysis

Preliminarily, there appears to be some confusion regarding what opinions Reese intends to offer. Defendant identifies the following:

> 1.    "The water temperature, measured from the faucet, at Mr. Edge's apartment was 27° Fahrenheit to 29° higher that [sic] the accepted safe maximum temperature setting of 120° Fahrenheit, as suggested in the *International Plumbing Code and Manufacturers Installation Guide*."
>
> 2.    "Keeping the water temperature at 120° Fahrenheit, when measured from the faucet, as recommended by plumbing standards, would have prevented the risk of scalds and burns."
>
> 3.    "Mr. Reese is expected to testify to the temperature of the bath water after defendant made changes to the plaintiff's water heater. Mr. Reese is expected to testify that the water temperature flowing from Plaintiff's bathtub faucet reached between 140°F and 149°F when [Mr. Edge] put his feet into the tub."

[Doc. 43 at Page ID # 726].

Plaintiffs do not object to Defendant's characterization of Reese's opinions. In their expert disclosures, however, Plaintiffs state that Reese "is expected to testify that the water temperature flowing from plaintiff's bathtub reach[ed] between 147°F and 149°F when [Billy] put his feet into the tub." [Doc. 42-1 at Page ID # 715]. During his deposition, Reese testified that his opinion

relates to "the temperature as [he] measured it on the date of [his] inspection . . . not necessarily the exact temperature that Mr. Edge put his feet in[.]" [Doc. 46-2 at Page ID # 924].

In addition, in his expert report, as discussed above, Reese opines as to accepted standards regarding the setting of hot water heater temperatures, including that the thermostat should not be set above 120°F and that, regardless of the thermostat setting, the water temperature should be measured at the faucet level and should not exceed 120°F at the faucet level [Doc. 42-2]. Reese also opines that the water temperature measured at Plaintiffs' faucet "was hotter than the thermostat setting" during Reese's test, which Reese asserts "is not an unusual finding." [*Id.*]. He opines that "[a]ny safeguards . . . that may have been in place to prevent the water temperature from exceeding 120°F were not working appropriately at the time of my testing," but he clarified during his deposition that he was referring to the rotational limit stop and that it *was* working properly, but it was set on a higher temperature setting [Doc. 42-2; Doc. 46-2 at Page ID # 919-20].

Defendant does not argue Reese is not qualified to testify regarding the proper temperature settings of hot water heaters or the generally accepted requirement that water temperature be measured from the faucet level and should not exceed 120°F at the faucet level. According to his CV, Reese is a "Master Plumber with a Master Plumbing License" as well as a "Master Gas License," and he has "successfully managed Reese Plumbing Co for thirty-four (34) years." [Doc. 42-2 at Page ID # 719]. He testified to his extensive experience performing residential plumbing work, including for apartment complexes [Doc. 46-2 at Page ID # 805-824].

On the current record and in the absence of contrary argument on the issue from Defendant, the Court finds Reese's testimony on these topics should not be excluded. Defendant's motion will be denied to the extent it seeks to exclude such testimony under Rule 702 or Rules 401-403.

20

In addition to proper temperature setting and measurement standards, such testimony would seem to also encompass the second opinion identified by Defendant, quoted above: "Keeping the water temperature at 120° Fahrenheit, when measured from the faucet, as recommended by plumbing standards, would have prevented the risk of scalds and burns." The Court finds such testimony is potentially relevant given Plaintiff's theory of liability and based on the facts in the current record.

However, to the extent Reese intends to opine as to the precise or even approximate temperature of Billy's bathwater on February 19, 2022, the Court finds such opinion is not based on sufficient facts and data and should be excluded from trial. This would include the temperature of the water Billy put his feet in as well as the temperature of the water flowing from the faucet.

True, Reese indicates in his expert report that he set the hot water heater thermostat "exactly as what was depicted in the photograph produced in discovery," referring to the photograph taken by Cansler [Doc. 42-2 at Page ID # 720]. The photograph of Cansler's setting in the record (exhibit 2 to Cansler's deposition, *see* Doc. 56-3 at Page ID # 1583), is blurry and certainly does not show the setting with any precision. A clearer version of what appears to be the same photograph is reproduced in Defendant's reply in support of its motion for summary judgment [Doc. 57 at Page ID # 1852], but even then, the image is blurry and the angle makes the numbers and position difficult to read. It also appears no one can agree to the temperature setting based on the photograph. As mentioned above, Cansler testified at one point in his deposition that he set the thermostat to "just below 150" [Doc. 40-3 at Page ID # 463], which Plaintiffs prefer to cite. At another point, he testified that the thermostat setting "wasn't 150," but rather "[i]t was about 135, 140" [*id.* at Page ID # 469], which Defendant prefers. The thermostat itself apparently only has indicators for 90°F, 125°F, and 150°F. As previously noted, Reese did not photograph the thermostat setting during his testing. As such, the two settings cannot be compared and Reese's

21

assertion that he set the thermometer in the same position as Cansler did cannot reasonably be tested.

In addition, Defendant's point regarding the differences between the way Billy drew his bath and the manner of Reese's testing is well-taken. Reese himself testified that "it takes longer for [a] hot water heater to recover or to heat up, or even to maintain its temperature" in January and February (when Billy took his ill-fated bath) [Doc. 46-2 at Page ID # 914]. Reese measured the temperature of the water in March. Further, Reese testified that "you've got to wait for hot water to get from the water heater to your fixture," because the water sitting in the pipes "from prior use" will come out first and will be cooler [*id.* at Page ID # 874-75]. Billy testified that he plugged the drain of the bathtub before turning the water on [Doc. 40-1 at Page ID # 353-54]. Reese measured temperature of the water flowing from the faucet, not the temperature of water pooled in the bathtub and potentially mixed with "prior use" water that had been cooling in the pipes.

The parties dispute whether Reese intended to "reenact" the conditions of Billy's bath/the temperature of the water flowing from the faucet, but it is not necessary for the Court to specifically resolve this question. Reenactment or not, any testimony regarding the temperature of Billy's bath or the temperature of the water flowing from the faucet at the time of Billy's bath would not be based on sufficient facts or data, and the Court finds it should be excluded. *See in re Scrap Metal*, 527 F.3d at 530-31 (where expert testimony "has a reasonable factual basis, it should not be excluded," however, where it "amounts to mere guess or speculation, the court should exclude [it]" (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

To the extent Reese intends to testify that the rotational limit stop was not set to limit the water temperature to 120°F when he conducted his testing, the Court finds such testimony need

not be excluded pursuant to Rule 702 or Rules 401-401. This testimony plainly falls into the "illustration of general scientific principles" category as opposed to a "reenactment of disputed events." *See Whitten v. Ams. Rsch. & Dev. Corp.*, No. 05-2761-JPM-TMP, 2008 WL 2943391, at *6 (W.D. Tenn. July 25, 2008) (citation omitted). The Court finds such testimony is at least potentially relevant and should not be excluded based on any other grounds Defendant argues in either of the pending motions.

Finally, the parties address spoliation issues in their briefing on the motion to exclude Reese; however, the Court finds such issues are adequately addressed in the Court's discussion of the spoliation sanction motion.

In summary, based on the current record and the parties' arguments, the Court will not exclude Reese's opinions regarding generally accepted standards for the setting and adjustment of residential hot water heaters and rotational limit stops. Reese may further testify that when he conducted his testing in March 2023, the rotational limit stop functioned properly (a point which appears undisputed as far as the Court can tell), but it was not set to limit the water temperature at the faucet level to 120°F. Reese may not testify as to the precise or approximate numerical temperature of Billy's bathwater or the water flowing from the faucet for the bath at issue on February 19, 2022.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for Spoliation Sanction [Doc. 44] is **GRANTED IN PART AND DENIED IN PART**. The Court finds Plaintiffs spoliated evidence of the position of the rotational limit stop but that Defendant's proposed sanctions go too far and do not account for other issues as identified herein. The parties are **ORDERED** to meet and confer

23

to propose an appropriate limiting jury instruction that conforms with this Order. The parties **SHALL** jointly file the proposed limiting jury instruction **14 DAYS** before trial.

Defendant's motion to Exclude and/or Disqualify Thomas Reese [Doc. 42] is **GRANTED IN PART AND DENIED IN PART** to the extent set forth herein.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE